COURT OF APPEALS
DECISION
DATED AND FILED

July 1, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2024AP1367**

STATE OF WISCONSIN

Cir. Ct. No.  2021GN14

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE PROTECTIVE PLACEMENT OF P. C. A.:

PIERCE COUNTY,

    PETITIONER-RESPONDENT,

 V.

P. C. A.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Pierce County: ELIZABETH L. ROHL, Judge. *Affirmed.*

¶1    HRUZ, J.[1]  Piper[2] appeals an order continuing her protective placement pursuant to WIS. STAT. ch. 55. Piper argues that Pierce County failed to

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

present sufficient evidence that she is in need of continued protective placement. For the reasons that follow, we disagree with Piper and affirm the order.

## BACKGROUND

¶2 Piper's protective placement began in 2021, when the County filed petitions for her permanent guardianship and protective placement after Piper was hospitalized due to a fall that prompted healthcare providers to recommend that she be transferred to an assisted living facility. The providers said that Piper needed help with activities of daily living (ADLs) and protection from self-harm. Piper was examined by a physician, Dr. Jackson Long, who filed a written report opining that Piper suffers from serious and persistent mental illnesses—specifically, alcohol abuse[3] and depression—and that her mental illnesses were likely to be permanent. Long concluded that Piper required protective placement, that she had a primary need for residential care and custody, that her incapacity

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than her initials. We do the same for Piper's significant other.

[3] Doctor Long categorized Piper's alcohol abuse as being a serious and persistent mental illness. However, in its oral ruling, the circuit court stated,

> [Long] indicated in his medical report that [Piper's impairments] were due to a serious and persistent mental illness, indicating depression as well as alcohol dependence…. [T]he legal definition, which is not necessarily something Dr. Long would be tuned into, would categorize the alcohol dependence under the other like incapacities, and so I think on that basis, the testimony would be for both serious and persistent mental illness as well as other like incapacities.

We note that WIS. STAT. § 55.01(6v) explicitly states that the definition of "serious and persistent mental illness" excludes "a primary diagnosis of a developmental disability or of alcohol or drug dependence." Piper does not raise any arguments regarding Dr. Long's characterization of alcohol abuse as legally being a serious and persistent mental illness. Under these circumstances, we do not address this issue further.

rendered her so incapable of providing for her own care as to create a substantial risk of serious harm to herself or others, and that her incapacity was permanent or likely to be permanent.

¶3    A protective placement hearing was held in December 2021, during which Dr. Long's report was received into evidence without objection. Long's report noted that Piper had a history of alcohol abuse, frequent falls, and poor self-care, such that she needed assistance "with most basic needs."

¶4    Michelle Anderson, a social worker for Pierce County, wrote two reports regarding Piper's condition and testified at the 2021 hearing.[4] Anderson's reports were received into evidence without objection. The reports stated that the County had contact with Piper for several years following multiple reported concerns regarding Piper's physical welfare and that Piper had been hospitalized five times in the last two months due to "ongoing weakness, alcohol use, inability to walk and physical health decline." Specifically, Anderson's report noted that Piper had been found "too weak to toilet herself" and was "sitting in her own excrements." Anderson's report stated that "[w]ith each hospitalization[,] the intensity of [Piper's] infection and care needs increased." The report also said that there were multiple concerns that "without intervention the current situation at the residence would result in the death of" Piper and/or her significant other, Ted, who was also found sitting in his own excrements.

¶5    Anderson noted in her report that she tried to work with Piper to arrange for home health services, but she was unsuccessful in doing so because

---

[4] At the time of the 2021 hearing, Michelle Anderson's last name was Meinen. For convenience, we refer to her as "Anderson" throughout the remainder of this opinion.

Piper "refused to disclose necessary financial paperwork, or would refuse to sign [a] release to get verifications for diagnoses," and because providers were "not willing" to work at her home due to Piper and Ted being "intoxicated, verbally aggressive and fighting with each other."

¶6      Piper testified at the 2021 hearing that the protective placement process began after she fell and broke her arm.  In addition, Piper generally disagreed with the testimony of Dr. Long and Anderson.

¶7      The circuit court credited both Dr. Long and Anderson and found that Piper suffered from impairments that were likely to be permanent and that her impairments were due to the serious and persistent mental illness of depression and "other like incapacities" in the form of alcohol abuse.  The court also found that Piper was incompetent, that she met the standard for protective placement because she needed to have her ADLs managed, and that she would be at a substantial risk of serious harm absent protective placement.  Further, the court noted that Piper needed to be placed in a facility with security measures due to her history of eloping.

¶8      The circuit court noted that there had been a

> significant amount of testimony regarding the condition of the apartment and [Piper's ability] to manage her activities of daily living, specifically as they relate to personal care, hygiene, toileting, etc.  Additionally, there [is] the added concern of the alcohol use … that may be contributing to physical debilitation as well as cognitive decline.

The court was referring to Dr. Long's testimony that Piper's falls were related to "her severe weakness" and "that her legs just wouldn't be able to support her when she tried to stand," as well as the infections that resulted from Piper's inability to move.  The court was also referring to Anderson's testimony regarding her

concern for Piper's physical welfare due to Piper being "found multiple times sitting in her own excrements that were causing infection and sepsis" and that Piper failed to "thrive" in her own apartment due to "her unwillingness to participate in physical therapy or occupational therapy to be able to get her body moving again to get to the bathroom."

¶9     Consistent with its factual findings, the circuit court entered an order for Piper's protective placement at an unlocked residential facility. The court also entered an order appointing a guardian of the person and a guardian of Piper's estate.

¶10     In September 2022, the County filed a petition for annual review of Piper's protective placement, requesting that it continue for another year. Piper requested a full hearing regarding the continued protective placement. The circuit court ordered an evaluation of Piper and appointed Dr. Kevin Miller, a psychologist, to conduct that evaluation. Piper did not request an independent evaluation. *See* WIS. STAT. § 55.18(3)(b).

¶11     The continued protective placement hearing was held in February 2023. At the hearing, Dr. Miller testified, and his evaluation report was received into evidence without objection. In his report, Miller opined that Piper's memory, reasoning, emotional/behavioral functioning, and other executive functioning were severely impaired. Miller noted that Piper was "unable to keep herself healthy due to recurrent falls, dietary insufficiency, and recurrent infections" and that her diagnoses included "Dementia, Alcohol Use Disorder, Alcohol Hepatitis, Hypertension, and Depression."

¶12     Doctor Miller opined in his report that Piper suffers from an incapacity—major neurocognitive disorder—"due to alcohol dementia." Miller's

report explained that Piper "did not believe she had any impairment" and that her incapacity interfered with her ability to: (1) "receive and evaluate information"; (2) "use information in a decision process"; (3) "communicate decisions"; (4) protect herself "from abuse, exploitation, neglect or rights violation"; (5) meet essential requirements" of her safety; (6) manage her "property and financial affairs"; (7) "address risk of property being dissipated in whole or in part"; (8) provide for her own support; and (9) "prevent financial exploitation." Miller explained that while Piper's condition had improved since 2021, this improvement was "the direct result of the services she ha[d] been provided" and that her condition was permanent or likely to be permanent.

¶13 Cheryl Braun, a social worker for Pierce County, also testified at the 2023 hearing, and her report was received into evidence without objection. In her report, Braun expressed concerns with Piper's behavior, noting that she had been physically and verbally aggressive toward staff and her roommate at her placement. Braun also noted that Piper had eloped from her placement and that an alarm was subsequently installed on her door to prevent further elopements. Braun also noted that Piper "refuses help" with ADLs and that staff have to provide "reminders and cues" for Piper regarding her ADLs.

¶14 Piper testified at the 2023 continued protective placement hearing. She generally disagreed with the testimony provided by Dr. Miller, Anderson, and Braun.

¶15 The circuit court credited Dr. Miller's testimony in finding that Piper continued to have "serious limitations" in her "memory," "reasoning, executive functionings, and emotional-behavioral functions," as well as "moderate impairments" in her "attention, sensory motor, and language and communication."

The court noted Miller's testimony acknowledging that Piper's condition had slightly improved during her protective placement but opining that this improvement was due to her being protectively placed and that any "significant improvements" were "unlikely." The court also acknowledged that Piper could perform some ADLs on her own, but it found that there was a need for care and custody of Piper due to her memory impairment causing danger "in terms of cooking unsupervised, or wandering, driving, things of that nature."

¶16 The circuit court based this latter finding on Miller's testimony, in which he expressed concern about Piper "wandering out of the facility or apartment, getting lost," and then suffering from exposure to the elements, particularly during the winter. The court also based this finding on Braun's testimony that Piper "hasn't bathed," will not go to recommended medical appointments, "won't eat if the staff prepares meals for her," and "won't take her medications"; that Piper needs assistance with ADLs "around the clock"; and that Piper had "some deterioration," in that she was having "increased bowel accidents" and "some bleeding."

¶17 The circuit court found that Piper "remains incompetent" and that she continues to meet the standards for protective placement because she "needs that primary residential care and custody as a result of the other like incapacities," specifically "the major neurocognitive disorder." Consistent with these findings, the court entered an order continuing Piper's protective placement.

¶18 In September 2023, the County filed a new petition for an annual review of Piper's protective placement. Piper contested her continued protective placement. The circuit court ordered that she be examined by Dr. Miller and scheduled a hearing for February 2024. Again, Piper did not request an

independent evaluation. *See* WIS. STAT. § 55.18(3)(b). This is the placement petition that is the subject of the current appeal.

¶19 At the February 2024 hearing, Dr. Miller testified that he met with Piper in November 2023 to evaluate her. According to Miller, after being informed of her rights, Piper "made a number of negative responses" and then elected to remain silent. Nonetheless, Miller characterized this examination as "very productive," as Piper behaved consistently with the history in her records and with Miller's previous examination of her. The County offered Dr. Miller's report into evidence, and Piper's counsel objected, arguing that the report was "entirely hearsay." The circuit court overruled Piper's objection, stating "[t]he objection as to hearsay is overruled, as it is an expert report."

¶20 Based on his examination of Piper, Dr. Miller opined that Piper suffers from a major neurocognitive disorder and that this disorder places her at risk of harm to herself through self-neglect and also places others at risk of harm by being physically assaulted by Piper. Specifically, Miller noted that in the past year, it was discovered that Piper might have a form of cancer for which she has "refused" treatment; has had cellulitis or an infection; has not attended medical appointments; and has had "dietary problems," in that she "routinely" refuses to eat food prepared for her and instead eats only white bread. Miller also noted that there was an incident in which Piper threw a water bottle at emergency medical services or law enforcement. Miller then surmised that Piper's major neurocognitive disorder is permanent or likely to be permanent.

¶21 Doctor Miller next opined that Piper requires residential care and custody because of her history of "falls and head injuries as well as multiple medical problems." Miller also noted that Piper suffers from alcoholic

encephalopathy, will suffer brain damage if she continues to drink alcohol, and needs her current level of residential care and custody to alleviate the risk of her drinking alcohol.

¶22     Jill Passofaro, an adult protection worker for the County, testified that she took over as Piper's caseworker after Braun left. Passofaro opined that Piper "requires supervision with all of her [ADLs]," specifically with "hygiene," meal preparation, "ambulation," and "personal cares." Passofaro noted that Piper had tried to elope from her placement "multiple times" so that she could return to an apartment that she shared with Ted. Passofaro also expressed her concern about Piper's medical issues and noted that Piper has refused to see a doctor and refuses to take medications.

¶23     Piper testified at the hearing and generally disagreed with Dr. Miller's and Passofaro's testimony. Piper contended that she did not need any assistance with ambulation, bathing, cooking, cleaning, or financial management. During her testimony, Piper acknowledged that she is prescribed medications, but she stated that she does not "need any" medications. She further explained that if her protective placement were not continued, she planned to live with her brother in Minnesota. Piper's guardian ad litem, however, opined that it was in Piper's best interest that her protective placement continue.

¶24     The circuit court found that Piper suffers from a major neurocognitive disorder and found Dr. Miller's testimony credible. The court noted that while Miller's examination was short, Miller had conducted a previous evaluation of Piper and had access to Piper's records. The court noted that Miller was "satisfied" that "the circumstances of [Piper's] presentation ha[d] not

9

changed," which the court found to be consistent with Passofaro's and Piper's testimony.

¶25    The circuit court found that Piper has a need for supervision and monitoring due to her need for assistance with ADLs, specifically, ambulation, transferring, eating, and hygiene.  Given Piper's needs, the court found that her current protective placement is the "least restrictive environment consistent with her needs."  The court ordered that Piper's protective placement continue for another year.  Piper now appeals.

## DISCUSSION

¶26    Piper argues that the County failed to present sufficient evidence to establish that she is in need of a protective placement order.  Specifically, Piper argues that there was insufficient evidence to prove that she has a primary need for residential care and custody, that she is incompetent, and that she cannot provide for herself so as to create a substantial risk of harm to herself or others.

¶27    Our review of a protective placement order presents a mixed question of law and fact. ***Douglas County v. J.M.***, No. 2022AP2035, unpublished slip op., ¶16 (WI App Nov. 28, 2023), *review denied* (WI App Apr. 16, 2024).[5] "The circuit court's factual findings will not be overturned unless clearly erroneous." ***Walworth County v. Therese B.***, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377 (citation omitted).  A finding of fact is clearly erroneous "when it is against the great weight and clear preponderance of the

---

[5] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

evidence.… [A]lthough evidence may have presented competing factual inferences, the circuit court's findings are to be sustained if they do not go against the great weight and clear preponderance of the evidence." *Hennessy v. Wells Fargo Bank, N.A.*, 2022 WI 2, ¶38, 400 Wis. 2d 50, 968 N.W.2d 684 (citation omitted). Whether the facts fulfill the legal standard for protective placement, however, is a question of law that we review independently. *Therese B.*, 267 Wis. 2d 310, ¶21 (citation omitted); *J.M.*, No. 2022AP2035, ¶16.

¶28    In *State ex rel. Watts v. Combined Community Services Board of Milwaukee County*, 122 Wis. 2d 65, 84, 362 N.W.2d 104 (1985), our supreme court ruled that "there must be an annual review of each protective placement." Further, a full due process hearing is required whenever the ward or the ward's guardian requests it. *Id.* at 85. This full due process hearing is colloquially referred to as a "*Watts* hearing." At a *Watts* hearing, the circuit court or jury "must find by clear and convincing evidence that the individual to be protected is in need of protective placement because he or she" meets all of the following standards:

> (a) The individual has a primary need for residential care and custody.
>
> (b) The individual is … an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.

(d) The individual has a disability that is permanent or likely to be permanent.[6]

WIS. STAT. §§ 55.10(4)(d), 55.08(1).

¶29　We begin our analysis by addressing a matter that is central to all of the issues argued by Piper—namely, the applicability of evidence from prior protective placement hearings to the current hearing.  In *J.M.*, we concluded that

> all reports and documents that have been admitted into evidence in the individual's prior protective placement proceedings may be relied upon, in addition to any witness testimony introduced during the individual's [current] due process hearing.  This reality is especially true for documentation submitted in conjunction with the petition under review—such as the required comprehensive evaluation from the initial placement and the required annual written review pursuant to WIS. STAT. §§ 55.11(1) and 55.18(1), respectively.

*J.M.*, No. 2022AP2035, ¶20.  We explained that

> [t]o the extent the record shows relatively recent opinions from qualified medical professionals … and there is no evidence that the opinions therein are stale or that the placed individual's underlying conditions or needs have materially changed, the court can rely upon those opinions, subject to any contrary evidence that is submitted.  If the placed individual wishes to challenge the continuing vitality of such opinions, he or she can request an independent evaluation under WIS. STAT. § 55.18(3)(b)3., as well as call his or her own witnesses under WIS. STAT. § 55.10(4)(c).

*J.M.*, No. 2022AP2035, ¶21.

---

[6] Piper does not contest that she has a disability that is permanent or likely to be permanent.

12

¶30    We note that at the 2024 hearing, the circuit court expressly found Dr. Miller's testimony to be credible.  Miller testified that the results of his examination of Piper for that hearing were "consistent with all the history" that Miller reviewed—including the examination he completed for the 2023 hearing— and that many of Piper's complaints from the examination for the 2023 hearing remained the same in 2024.  Piper does not argue that any of the adjudicated evidence or opinions from the 2023 hearing are stale or that her conditions or needs have, in fact, materially changed.  Notably, Piper also did not request that she be examined by an independent evaluator.  *See* WIS. STAT. § 55.18(3)(b).

¶31    Under these circumstances, and consistent with *J.M.*, we consider the evidence that *has been adjudicated*—i.e., documentary evidence that was admitted and testimony that was accepted by the circuit court and incorporated into its findings following those hearings—at Piper's initial 2021 protective placement hearing and the 2023 continued protective placement hearing in conjunction with the evidence presented at the 2024 hearing.[7]  Contrary to Piper's

---

[7] We pause to note that *Douglas County v. J.M.*, No. 2022AP2035, unpublished slip op. (WI App Nov. 28, 2023), *review denied* (WI App Apr. 16, 2024), was subsequently analyzed in *Ozaukee County v. S.S.*, No. 2024AP759-FT, unpublished slip op. (WI App Sept. 11, 2024), *review denied* (WI App Jan. 16, 2025).  In *S.S.*, we concluded that "this court will not exclude from its analysis the reports *and hearing testimony* related to [the subject individual's] past protective placements."  *S.S.*, No. 2024AP759-FT, ¶9.  We based this conclusion on *J.M.*'s holding that "all reports and documents that have been admitted into evidence in the individual's prior protective placement proceedings may be relied upon, in addition to any witness testimony introduced during the individual's due process hearing."  *S.S.*, No. 2024AP759-FT, ¶8 (quoting *J.M.*, No. 2022AP2035, ¶20).

(continued)

contention, our doing so does not "turn" *Watts* and WIS. STAT. § 55.18 "on their heads." At the 2024 hearing, the County was still required to prove that Piper currently met the statutory criteria; it simply could rely on, and refer back to, previously submitted and adjudicated evidence to explain the current situation that Piper faced. In that regard, and for the reasons explained below, we disagree with Piper's assertions that the County "relied solely on [her] past" and "fail[ed] to

---

While the *S.S.* court overall did an excellent job analyzing *J.M.*, we are concerned that the *S.S.* court overstated the extent to which a circuit court can consider evidence from prior *Watts* hearings. Specifically, we read *J.M.* as permitting a court to look only to evidence *that has previously been adjudicated*—i.e., the reports that have been admitted into evidence and the circuit court's findings of fact. To the extent that the court's findings of fact mirror a witness's testimony from a prior hearing, those findings can be considered by courts at future *Watts* hearings. However, future courts cannot consider testimony regarding facts that were not adopted by the circuit court and thereby have not been adjudicated. In this regard, and to clarify, it may have been better had the word "current" been added before "due process hearing" in the above-quoted sentence from *J.M.*

While this interpretation requires treating reports that have been admitted into evidence differently from testimonial evidence—in that testimony from a prior hearing can only be relied upon if mirrored by the prior court's factual findings—this treatment is because the underlying basis for considering the reports as adjudicative facts differs from the basis for considering evidence resulting from testimony as adjudicative facts. Specifically, the pertinent reports are filed with the court and become a part of the subject individual's record, both for the protective placement hearing for which the report is submitted *and* for the subsequent *Watts* hearings. *See* WIS. STAT. § 55.18(1)(a) (noting that the review under § 55.18(1) "shall be made a part of the permanent record of the individual"); *cf Perkins v. State*, 61 Wis. 2d 341, 346, 212 N.W.2d 141 (1973) (noting that courts "cannot take judicial notice of records *that are not immediately accessible to it or are not under its immediate control*" (emphasis added)).

The basis for considering testimony that has been adopted by the circuit court in its factual findings as an adjudicative fact, however, stems from the definition of "adjudicative fact." "Adjudicative facts are 'simply the facts of the particular case,' that is, 'who did what, where, when, how, and with what motive or intent.'" *State v. Harvey*, 2001 WI App 59, ¶7, 242 Wis. 2d 189, 625 N.W.2d 892 (citation omitted). "When a court or an agency finds facts concerning the immediate parties … the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts." 7 DANIEL D. BLINKA, WISCONSIN PRACTICE SERIES: WISCONSIN EVIDENCE § 201.2 (4th ed. 2024) (citation omitted). Thus, it is not the testimony itself that is an adjudicative fact; but, rather, the circuit court's factual findings, in which it relied upon certain testimony.

connect[] the dots between [Piper's] history and her current condition to show that she still needs protective placement."

## I. Primary Need for Residential Care and Custody

¶32    Piper argues that while the County demonstrated that "residential care is adequate" to meet Piper's needs, it did not prove that she has a primary need for residential care and custody. Further, Piper argues that "the [C]ounty did not provide any facts on financial exploitation or any abuse or neglect happening in the past that would have allowed the circuit court to base its decision on one of those factors." Piper also notes that the court did not discuss financial exploitation, abuse, or neglect in reaching its decision.

¶33    A "primary need for residential care and custody" means that "a person must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." *Jackson Cnty. DHHS v. Susan H.*, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785 N.W.2d 677. As detailed above, the evidence from the record leading up to the 2024 hearing outlined that the County's petition for protective placement was originally filed due to concerns from Piper's healthcare providers that she needed assistance with ADLs and to protect her from self-harm, due to her alcohol abuse and self-neglect. At the 2024 hearing, Dr. Miller specifically testified that Piper refused to seek medical attention for a cancer from which she may be suffering, she refused to attend medical appointments, she had an infection or cellulitis, and there were dietary concerns due to her refusing to eat food prepared for her. Miller and Passofaro also stated that Piper needs residential care and custody because of her history of

falls, her medical problems, and to alleviate the risk of her drinking and suffering brain damage due to her alcoholic encephalopathy.

¶34    We conclude that the entire protective placement record, including the evidence presented at the 2024 hearing, shows that Piper continues to have a primary need for residential care and custody.

¶35    Piper attempts to discount the foregoing by pointing to evidence that her condition improved during the year preceding the 2024 hearing and that she is physically capable of performing certain tasks related to personal hygiene and feeding herself.  However, Piper does not assert that the circuit court's findings relying on the above evidence are clearly erroneous.  While there was evidence that Piper could perform some tasks by herself, "[t]he weight of the testimony and the credibility of witnesses are primarily determinations to be made by the finder of fact … and where more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the one reached by the fact finder."  *Landrey v. United Servs. Auto. Ass'n*, 49 Wis. 2d 150, 157, 181 N.W.2d 407 (1970).

¶36    The circuit court credited the testimony and concerns of Dr. Miller, Braun, and Passofaro.  Specifically, the court found that Piper still requires "24/7" supervision for ambulation, her medical needs, food, and hygiene.  These findings are not clearly erroneous, and we agree that these findings support the ultimate conclusion that Piper has a primary need for residential care and custody.

## II. Competency

¶37    Piper next argues that the County presented insufficient evidence to prove that she is incompetent.[8]  Piper contends that the testimony presented at the 2024 hearing shows merely that she is frustrated with the staff at the facility where she is placed and that she feels "abused and mistreated."  She argues, however, that this evidence does not prove her incompetence.

¶38    Incompetence for the purposes of a guardianship of the person and a protective placement is established by proving, by clear and convincing evidence, that the following elements are met:

> 1. The individual is aged at least 17 years and 9 months.
>
> 2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the

---

[8] We pause to note that WIS. STAT. § 55.08(1)(b)—which provides that the individual for whom protective placement is sought must be "an adult who has been determined to be incompetent by a circuit court"—*by itself* appears to be ambiguous as to whether a circuit court must reevaluate competency for each continued protective placement hearing or whether this element may be satisfied by a previous finding of incompetency, such as the incompetency finding that is required for a guardianship.

Neither Piper nor the County has fully briefed this issue.  Piper merely asserts, without any reference to legal authority, that "[w]ithout an ongoing demonstration of incompetence, a request for continued protective placement necessarily fails."  The County, in turn, merely responds that Piper's "conduct and behavior during court activities only demonstrate continued incompetency."

We note that WIS. STAT. § 55.075(3) provides: "If the individual is adjudicated incompetent in this state more than 12 months before the filing of an application for protective placement or protective services on his or her behalf, the court shall review the finding of incompetency."  Further, this court has "squarely reject[ed]" the argument that a petitioner need not prove incompetency at continued protective placement hearings, as it is possible for a person's incompetence to change over time.  *Sheboygan County v. Terry L.M.*, No. 2014AP2010, unpublished slip op., ¶¶8-9 (WI App Apr. 1, 2015).  Accordingly, we consider whether the County presented sufficient evidence to prove Piper's incompetence.

> individual is unable to meet the essential requirements for his or her physical health and safety.
>
> ….
>
> 4. The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under [WIS. STAT.] ch. 52, or other means that the individual will accept.

WIS. STAT. § 54.10(3)(a);[9] *see also* **Wood County v. P.J.L.**, No. 2024AP2098-FT, unpublished slip op., ¶¶13-25 (WI App Jan. 9, 2025) (analyzing whether the subject was incompetent—for the purposes of a contested protective placement—by analyzing the elements listed above).

¶39　We conclude that Piper is incompetent under WIS. STAT. §§ 54.10(3)(a) and 55.08(1)(b).　Piper's age is not at issue, and she does not contest that she has been diagnosed with a major neurocognitive disorder resulting from her alcohol abuse, which meets the applicable definition of "other like incapacities" in WIS. STAT. § 54.01(22).[10]

¶40　Some of the ongoing concerns for Piper have involved her hygiene and ambulation—specifically as they relate to her sitting in her own excrement, leading to infections—as well as her causing further brain damage to herself by

---

[9] WISCONSIN STAT. § 54.10(3)(a) contains additional requirements, not relevant to this appeal, for establishing incompetence for the purposes of appointment of a guardian of the estate. *See* § 54.10(3)(a)3.

[10] The term "[o]ther like incapacities" is defined as "those conditions incurred at any age which are the result of accident, organic brain damage, mental or physical disability, or continued consumption or absorption of substances, and that produce a condition that substantially impairs an individual from providing for his or her own care or custody." WIS. STAT. § 54.01(22).

drinking alcohol. Further, Dr. Miller testified that as a result of Piper's major neurocognitive disorder, these concerns are ongoing; that Piper had suffered from falls and from cellulitis or an infection within the past year; that Piper refuses to attend medical appointments and to seek medical attention for her possible form of cancer; that she demonstrates a persistent unwillingness to cooperate with those who have been tasked with caring for her, both before and during her protective placement; and that Miller's concerns arise from Piper's major neurocognitive disorder. Both Miller and Passofaro testified that Piper's current environment is the least restrictive environment for her, which supports a finding that Piper's needs cannot be effectively met in a less restrictive environment. Therefore, despite Piper having shown some improvement in her current placement setting, this evidence supports a finding that she cannot meet the essential requirements for her physical health and safety due to her impairment.

### III. Substantial Risk of Serious Harm

¶41 Piper lastly argues that the County presented insufficient evidence to prove that she cannot provide for herself so as to create a substantial risk of serious harm to herself or others. Piper contends that the evidence "proved only" that she "can sometimes disagree with staff and be argumentative." Piper also asserts that Dr. Miller did not present evidence that she would drink alcohol if she were not protectively placed. In addition, she argues that while she was "skeptical of treatment" for her possible cancer, that skepticism does not demonstrate her inability to live on her own. Finally, Piper also asserts that Miller and Passofaro stated that she is able to feed herself.

¶42 WISCONSIN STAT. § 55.08(1)(c) requires that a subject for whom protective placement is sought must be "so totally incapable of providing for his or

her own care or custody as to create a substantial risk of serious harm to himself or herself or others" "[a]s a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities."

¶43    A person is totally incapable of providing for his or her care under [WIS. STAT.] § 55.08(1)(c) if the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others. *Susan H.*, 326 Wis. 2d 246, ¶17. The "custody" alternative in § 55.08(1)(c), in turn, means "that the person cannot provide for himself or herself the protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Id.* "The risk of harm must be substantial. Mere speculation as to difficulties [the subject] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement. Furthermore, the foreseeable harm must be serious.… [M]inor accidents, injuries and illness are not sufficient to satisfy this requirement." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979).[11]

¶44    Turning to the relevant evidence, the circuit court determined that Dr. Miller credibly testified that due to Piper's alcoholic encephalopathy, if Piper ingests "any alcohol at this point," it will cause her more brain damage, and, as a result, Piper needs residential care and custody to alleviate the risk of her drinking. Brain damage certainly qualifies as a substantial and specific harm, and, given this

---

[11] Before delving into the most probative evidence, we reject Piper's characterization of the evidence as "prov[ing] only" that she "can sometimes disagree with staff and be argumentative." Most notably, Piper does not just generally disagree and argue with her group home's staff; she repeatedly argues with them over what she needs to remain healthy and safe, including her need for medical treatment. In other words, Piper's own repeated and strident dismissiveness of her history and conditions is itself a problem for her current well-being.

credited testimony in conjunction with the other evidence regarding Piper's history of drinking, it is foreseeable that Piper will drink alcohol if she is not protectively placed.

¶45 Piper stated that she is "not an alcoholic" and that she is "not a drinker." These statements, however, were directly contradicted by Dr. Miller's reports and testimony, in which he diagnosed Piper with alcohol use disorder, alcohol hepatitis, alcohol dementia, and alcoholic encephalopathy.[12] While Piper may disagree with Miller, the circuit court is "the sole arbiter of credibility issues and will be sustained if facts in the record support the court's conclusions." *See State v. Sloan*, 2007 WI App 146, ¶21, 303 Wis. 2d 438, 736 N.W.2d 189. Regardless, we also note that Piper herself stated during the relevant *Watts* hearing that she was "going to have a brandy" due to her fiancé's death. Accordingly, we agree with the court's finding that Piper is so totally incapable of providing for her own care as to create a substantial risk of serious harm to herself.

## CONCLUSION

¶46 In summary, Piper's arguments on appeal essentially ask us to reweigh the evidence and to find her credible. Piper's arguments fail. There is ample evidence—both from the prior protective placement hearings and the 2024 hearing—to support the circuit court's factual findings, which themselves support

---

[12] We pause to note that Dr. Miller's reports and testimony go far beyond merely diagnosing Piper with alcoholism. Miller's November 2023 report diagnoses Piper as suffering from "Major Neurocognitive Disorder due to Multiple Etiologies including but not limited to alcoholic encephalopathy." Miller testified that alcoholic encephalopathy "is basically swelling and damage to the brain due to alcohol" and that Piper will cause further brain damage to herself if she ingests "any alcohol at this point." Accordingly, Miller's opinions spoke to physical risks of harm to Piper from drinking any further alcohol.

the legal determination that Piper meets the standards for protective placement. We therefore affirm the order continuing Piper's protective placement.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.